Mr. Olson, we'll hear from you. Good morning. May it please the Court, I'm Doug Olson. I'm an assistant with the Federal Defender's Office here in Minnesota, and I am representing Mr. Conley here in this appeal. This case arises from a situation where Mr. Conley voluntarily went to the Hennepin County Medical Center for treatment for a gunshot wound to his leg, leading to his refusal for medical treatment, his request to leave the facility, and a response by the people there in which he was rassled by at least three people against his will, held down to a bed, injected twice with sedatives. Okay. Can I ask a question about that progression of events? You've said both that he refused medical care and asked to leave, and I want to sort of understand that a little bit more because it's a very short time period as I understand it. And as I saw the record, he says, we want to take your shirt off, and he says, no, no, you can't make me do anything. Was there any particular medical procedure? Like, were they in the midst of, is there a factual record on whether or not there was actual medical treatment that they were trying to administer to him that he expressly declined? It appears so. He's sitting, and I'll come back to the video, which I'm going to offer to the court to review, is that he's sitting on the bed for most of this encounter when he's got this group. There's 15 people, medical officers, police officers, all around him in this room. The most part, he's sitting on the bed patiently up, and he's looking at this gunshot wound, and they're trying to interact with him and do something to him. And he's saying no. He doesn't let them, it appears he doesn't let them touch him. He says, no, I don't want this. I want to, he says, so he's refusing this medical treatment. Some point in time, he wants to leave. This then progresses into this. Why didn't he come in at all? Somebody dropped him off, and this is a good question, but somebody dropped him off, and when he was in the situation, at one point in time, he's looking at his leg, and he says it's a little hole. So he ends up in a situation where he's no longer concerned about the medical treatment, medical care. He refuses treatment, and they rassle him down, shoot him twice with sedatives, leading to the discovery of the gun. Now, the issue, it's an unusual fact situation. A lot of these Fourth Amendment fact situations are. But he, so the distinguishing factors here are a couple of things, is that he came in voluntarily. He wasn't mentally ill. He wasn't incapacitated. He wasn't unconscious. He wasn't bleeding out. And he doesn't have a lot of these factors, which come into the analysis, and I'll get to that in a second. But there's two questions that the court has to determine in order to get to the bottom line here. Number one is the standard to be applied here. And there's, you know, with the briefing, there's some back and forth here between district court, the government, and even arguably us. But the standard is set forth in the Graham decision, which was, it's about mental health, but it applies to every standard in these encounters. And it states simply, but as with other police functions, all seizures done for non-ambulatory purposes are governed by the Fourth Amendment's reasonable balancing test. As a result, the group... Why wouldn't it be just per se reasonable for a hospital to make sure that a patient involved in a gunfight isn't armed in their patient rooms? Well, maybe that would be, that's not what happened here. You know, maybe that would be a different... Well, I thought it was what happened here. The security guard is the one who pushed on his midsection. No, they came at him with syringes and strapped him down for his medical care treatment, and then they discovered he had a gun in him. They weren't frisking him down in a citizen carry encounter at all. This was a forced medication situation. Well, if that would have been permissible, then wouldn't this be covered by that rule? Well, if it would have happened in a calm encounter as he came into the hospital at the door, we'd have a different situation here. But we have a different situation here because we have a person who has asked to leave. He hasn't committed a crime. All right? He's not high and under the influence of drugs. He's not acting violent. And all he's wanting to do at this point in time, he's asking for his right to leave the hospital and go when the encounter ensues. Did the district court make a finding on a request to leave? I think that they did. And expressly said that... Yeah. My understanding is that it's in the record. I'd have to go back to the R&R that he said that he wanted to leave. He clearly wanted to... He didn't want anybody to touch him. He was refusing medical care. Well, that's different from saying, I want to leave. He did say, I want to leave. It is in the video at some point in time. He did express his willingness to leave. And he didn't want anybody to touch him. He didn't want the care. So they jumped on him, strapped him down, and that leading to the discovery of the gun. But the touchstone, it's a question of reasonableness. And as in Graham states, as a result, the greater intrusion on a citizen, the greater justification required for that intrusion to be reasonable. Thus, if the detention evolves into an arrest, it must be justified by probable cause. That's essentially what happened here is that they just came after him, injected him twice against his will, held him down. And it's a violent encounter. It's excessive force. It's a fairly violent encounter, what took place here, which we believe requires a justification rising to the level of probable cause. Are you saying that that qualified as an arrest? Yes. Okay. Why? What under, how did you come to that conclusion under the standard? It's because of the nature of the encounter at that point in time. It's not free to leave. He's been injected twice with sedatives. He's got multiple people holding him down. That's the equivalent of an arrest, which would otherwise require probable cause. That's right, black and white and Graham. But the question becomes, and you can even, if you know him, characterize it as arrest. We believe that is distinctive because once it's an arrest, it's got to be probable cause. Probable cause that he presents a danger to himself or others. Not in the record. Guy's just sitting on the bed. He doesn't want any more treatment. He's not high. He's not violent. He's not acting unusual other than he doesn't want any more treatment. Did he get any treatment? I guess I'm sort of maybe in line with Judge Colleton's question. A fellow comes voluntarily into the emergency room, goes into the area where he's going to get treated. I think there's the assumption he came there to get help with the problem. And I'm just wondering when does it, at what point does it? He changed his mind. I mean, as simple as that. He's not bleeding out on this gurney. Well, the doctors are quoted as saying you're bleeding inside. You're getting closer to dying. Well, they're doing that. This is an encounter with him. They're telling him that. They don't know that. They're just looking at a guy who's just sitting there on the bed. After the fact, we now know that he wasn't bleeding out? They don't know that he was. They're presented with a man with a gunshot wound in the leg. They're trying to encourage him to participate in the treatment of medical care. They're saying these things to him, but they don't know because they're just looking at the same thing he's looking at. He's got a hole in his leg, and he's not bleeding out. So they haven't touched him. They haven't treated him, and they're saying these things to try and get him to comply. And he refuses, which he has a right to do. In the Balancing Act here, there's two critical aspects once you get into the Balancing Act, which is required under Graham to determine if it's objectively reasonable. You have to look at the nature of the intrusion and the government interest here. But the nature of the intrusion here is twofold. Number one, this isn't just a brief detention to see what's going on. This is a full strapping down against his will, including syringes and use of a lot of force. You keep bringing up syringes and injections. You think that may be an appealing argument, I guess. But I thought the objection here was to the fact that the security man put his hand on his chest and fell the weapon. Well, the encounter... The syringes don't even do with the seizure of the gun, do they? Oh, they have to do with the seizure. It's the seizure of the person, which is the issue here, which is the injection, which is the wrestling down. And they're holding him down. That leads to the discovery of the gun. That's why the two injections are important, because they had to inject and twice sedate him, get him down. And then after they've done, that's the encounter that we're arguing here is the functional equivalent of an arrest. And this isn't a brief two-minute thing. It took two minutes to discover the gun. But it's the entirety of the encounter where they strap him down. Okay. All right. Do you want to save any time for rebuttal? I'll just say there's a significant piece that's missing in the analysis here is that in terms of weight, it's always weighing the individual interest versus the government. And the individual interest, he has an interest. He has an absolute right to refuse medical attention. That's the law. And they could complain about it, but people do that. And so he has an individual interest not to be strapped down, not to be injected against as well. He has a right to refuse individual interest. That has to be built into the balancing formula here. It was disregarded by the district court, disregarded by the government. Okay. Thank you for your argument. Thank you. Mr. Jacobs, we'll hear from you. May it please the Court. Your Honors, Assistant United States Attorney Harry Jacobs on behalf of the United States. The district court properly determined that if there was a Fourth Amendment seizure, it was a reasonable seizure here. But I want to start today. By talking about why it wasn't a Fourth Amendment seizure at the outset. Now the Fourth Amendment applies to a limited range of government conduct that's designed to elicit a benefit for the government. And a benefit that is in an investigatory or administrative context. And at its core, the Fourth Amendment is designed to apply to the conduct of law enforcement officers. And to the extent that the Fourth Amendment applies outside of those bounds, then the conduct that it should apply to should approximate the type of activities that law enforcement are conducting and that the Fourth Amendment was intended to apply to. Which is searches and seizures. Well, counsel, doesn't the way the Graham test says is the line of cases that's straightforward. Doesn't it say the Fourth Amendment's what's governing here even if it's a brief detention and it only requires a reasonable belief of an emergency? Don't they say that they're talking about describing the Fourth Amendment? I think they are. Do I understand your argument? I think they are talking about the Fourth Amendment there. But it's a different context. Because in Graham, we're dealing with something that's clearly administrative. And we're in an American country. Well, I'm talking about what our Court says on their struct there. It's summarizing our cases. Gosh, on page 885 of the opinion. Go ahead and tell me what you're saying. What I'm saying is that in Graham, the Fourth Amendment certainly applies to investigatory or administrative actions by a government actor. In Graham, we're squarely in the administrative conduct because the government actors in Graham are enforcing an administrative or statutory regime. So certainly the Fourth Amendment would apply there because the government under a mental health hold. Did you object to the magistrate court's conclusion otherwise in the district court below? We didn't object to the magistrate judge's conclusion, although we briefed it. And this court can certainly affirm the district court's decision on any basis that's supported by the record, which... But you're asking us to affirm it for a reason different than you ask the district  That's correct, Your Honor. And what I think this Court has made clear in cases like Inman is that although the Fourth Amendment can apply, the Fourth Amendment does apply to government actors, it doesn't necessarily apply to all government actors. And what Inman suggests based on its citations to and references to the Atzin case out of the Ninth Circuit is that a government actor, a Fourth, the Fourth Amendment applies to a government actor when that individual is acting with an investigatory or an administrative purpose. So we're looking at the intent of that government actor, not merely the fact that their paycheck comes from the government, but what is the intent? But these weren't medical providers. They weren't medical providers, certainly, but they were hospital security guards. They're security staff. Absolutely. But they're acting, as the district court found, for the purpose of furthering the medical providers, in addition to keeping the hospital safe, in addition to that as well, both bases here. But I think the point is, regardless of whether they're medical providers or hospital security guard tasked with keeping the hospital safe or supporting the medical providers, they're not acting with an investigatory or administrative purpose here. They're acting within their role as a security guard to do those things. And they're not furthering some – when we're looking at what does an administrative purpose mean? Because I think they're clearly not acting in an investigatory purpose. The district court found that. They're not acting to investigate a crime. They didn't realize that a crime had taken place when the temporary restraint occurred. What if Mr. Conley did refuse, clearly, medical care? I don't want you touching me. If that's the factual finding, how does that affect the reasonableness of this seizure? If we assume it's a seizure. Let's assume a seizure for purposes of this question. So I don't think that this is a case about medical treatment. And here's why. Because the restraint that we're talking about occurred before any medical treatment happened. The restraint that we're talking about is the security guard putting his hand on Mr. Conley, ultimately holding him down. But was that after he said, I don't want you to do anything? It was. It was after he said – So your position is that's not a denial of medical care? Well, I think my – the government's position is that we don't know what that is. And when we're looking at reasonableness, context matters. And when we're looking at reasonableness, we're looking through the lens of the person at that time, not with 20-20 hindsight. So we're looking through the context of a hospital security guard who sees someone with a potentially life-threatening gunshot wound to the leg, and we're trying to determine what is reasonable for that person to assume. And comments – Was he acting at the behest of the doctors at that point, the security officer, and trying to get the man to lay down? In conjunction with the doctors, potentially. The district court found that he was acting to assist the doctors with medical treatment, certainly. So we're looking – the security guard, what he's seeing is an individual with a gunshot wound. He's seeing doctors attempting to examine this individual, and it's certainly reasonable for him to act that way. The idea that an individual with a gunshot wound could say, I don't want to – I don't want to take my shirt off, I don't want to – and that's a denial of medical care in that specific moment, such that an individual security guard couldn't put his hand on the individual to try and see if he is in shock, if he is competent. I mean, he came in with a significant gunshot wound, so him saying, I don't want to doesn't arise to that level of a denial of medical care. Certainly doesn't arise to it becoming unreasonable to put his hand on him, to try and hold him down. So the medical professionals can make that analysis, and can determine whether he is denying medical care. And that – I was looking for a finding about whether he asked to leave. I didn't see it in my quick look here. Do you recall whether there's a finding on whether he actually asked to leave the hospital, or said he wanted to leave the hospital? He makes comments about wanting to get up. There's no finding – he makes those comments and that is in the record. There's no finding from the district court that him saying that was a denial of medical care. In fact, the – What do you mean by a denial? You mean a request not to have medical care? Correct. And in fact, the district court did find that this wasn't a case that  or other cases that deal with a probable cause standard, because it did devolve into what is akin to an arrest or a mental health hold. That is different than what happened here. And importantly, I think that allowing the medical staff to safely and effectively treat a patient, or at least come up with a determination, is an incredibly important government interest. Conley's condition was life-threatening or potentially life-threatening. You can hear the doctors make comments about that. And the security guard, as the district court found, was independently acting not only to further that medical treatment, but to create a safe environment within that hospital and to prevent Mr. Conley further kicking in close proximity to some of those health care providers. And then we weigh that against the quality of the intrusion here. And again, I would respectfully say to this Court that this is not a case about unwanted medical care. This is a case about the intrusion of a security guard holding an individual down temporarily for a brief period of time. It's not about whatever injection or health care treatment he received after that point. There's a different remedy for that. You can file the 1980s. Is the timeline clear on that, that the hand of the chest was before the injections? Yes, it is. I thought the sedative was before the hand on the chest. The sedative. The sedative. The injection was after the hand on the chest. The District Court found that the at least initial seizure, a restraint occurred before any medical treatment was issued. In fact, you can see in the video that he's moving around. He couldn't have been injected but for the holding down. Now, there are comments about how a nurse is drawing up a syringe prior to that injection. But the actual injection occurred after the guard placed his hand on the defendant's or on Mr. Conley's chest. And, Your Honors, I see that I'm out of time. I'm happy to address the exclusionary rule. And if Your Honors have no further questions, thank you for your time. Well, I think your time has expired. You did brief the exclusionary rule, as I recall. So we'll consider that on the briefs. Thank you. Thank you for your argument. And, Mr. Olson, I believe you used your time. Can I ask for 30 seconds? Well, I was trying to get you to save your 30 seconds and you said no. I'll give you 30 seconds to clarify whether the injections occurred after the hand on the chest. My belief is that the injection occurred simultaneously with him being restrained. The reason I was going to approach is that one of the things that was brought to my attention in the briefing of the case, I wasn't the underlying attorney here, is that the exhibits, including the video of this encounter, was not in the record for the Eighth Circuit. So I'm going to ask the court for permission to submit that. It shows the entire encounter. Is it in the record of the district court? Yes. Yes. So we can get it then. Oh, okay. You get it then. Because that does show the timeline here. Okay. Everything is on there. I was new to the case and I looked at it. It shows everything. If we don't have it yet, we can have our clerk get it from the district court. That's why I wanted to encourage you. Very well. Thank you. Noted. Thank you. Thank you for your argument. The case is submitted and the court will file a decision in due course.